**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 24-80103-CR-CANNON**

**UNITED STATES OF AMERICA**,

Plaintiff,

v.

**DUSTIN SEAN MCCABE,**

Defendant.
_________________________________/

**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL**

**THIS CAUSE** comes before the Court upon Defendant Dustin Sean McCabe's Motion for Judgment of Acquittal (the "Motion") [ECF No. 95]. The Court has reviewed the Motion, the United States' Opposition [ECF No. 98], Defendant's First and Second Replies [ECF Nos. 101, 104], and the full record.[1] Following that review, Defendant's Motion [ECF No. 95] is **DENIED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

On August 22, 2024, a grand jury in the Southern District of Florida returned an indictment charging Defendant with one count of Seaman's Manslaughter, in violation 18 U.S.C. § 1115 (Count I); one count of False Statement within the Jurisdiction of an Agency of the United States, in violation of 18 U.S.C. § 1001(a)(2) (Count II); and three counts of Wire Fraud, in violation of 18 U.S.C. § 1343 (Counts III–V) [ECF No. 3].

[1] Defendant filed a second reply because of an erroneous Notice by the Clerk requesting that Defendant refile "a legible copy of the document." [ECF Nos. 101–104]. Instead of refiling the initial reply, however, Defendant filed a second version of his reply which omits some arguments, presents others, and corrects several typographical errors. The Court did not authorize a substantive amendment in this fashion but elects under the circumstances to consider both replies as noted in this Order.

The Court held a seven-day jury trial from February 24, 2025, to March 4, 2025.[2] As further detailed below, the trial evidence showed that Defendant misrepresented his Vessel as a recreational boat and was negligent in his alteration and maintenance of that Vessel, among other negligent acts, resulting in the death of the victim M.C.G. (the Seaman's Manslaughter and False Statement charges). Defendant also fraudulently applied for small business loans after his Vessel was shut down following the victim's death—through the federal government's Paycheck Protection Program—and spent the loan balances in part on his personal affairs (the Wire Fraud charges). Defendant testified at trial, and the jury returned a verdict of guilty on all counts [ECF No. 83; *see* ECF No. 114 p. 80 (adjudication of guilt)]. The evidence is further summarized below.

*Seaman's Manslaughter* (Count I: 18 U.S.C. § 1115)

In March 2020, Defendant purchased the subject Vessel, a sportfishing boat named the Southern Comfort, for the purpose of running a concierge/luxury scuba diving charter business through his entity, Florida Scuba Charters [ECF No. 91-54 p. 4 (GX73); ECF No. 113 pp. 14–15]. Defendant made various modifications to the fishing boat to enable its use for scuba diving, including removing engine controls from the helm [*see* ECF No. 91-51 (GX68 photo of Vessel with rear engine controls removed); ECF No. 91-56 (GX75 check for ladder and platform modification); ECF No. 91-57 (GX76 check for dive bench modification); ECF No. 113 pp. 16–20]. The Southern Comfort (unlike Defendant's previous diving vessel) is a sportfishing boat not typically used for scuba diving [ECF No. 108 pp. 288–290 (Carl McManus testimony); *see also* ECF No. 109 pp. 12–13 (Dockmaster Jordan McKenna testifying that he has never seen a fishing

[2] The trial transcripts are docketed as follows: Day 1 [ECF No. 108]; Day 2 [ECF No. 109]; Day 3 [ECF No. 110]; Day 4 [ECF No. 111]; Day 5 [ECF No. 112]; Day 6 [ECF No. 113]; Day 7 [ECF No. 114].

boat used for scuba diving charters)]. This point was reinforced by Steve Poznak—Defendant's business partner at the time and co-signer of the Vessel—who described Defendant's motivation for the atypical choice to outfit a fishing boat for scuba diving [*see* ECF No. 91-54 (GX73); ECF No. 91-55 (GX74 Vessel Title and Mortgage); ECF No. 109 pp. 37–38, 42–43 (Poznak testifying that Defendant chose to alter a fishing vessel because it could go at faster speeds and had larger and more powerful propellers than traditional dive boats)].

On March 28, 2020, soon after Defendant's purchase of the Southern Comfort, and after Defendant made the modifications referenced above, Defendant arranged a paid dive charter for at least two scuba passengers, Jennifer Hester and Carl McManus, along with one crewmember. Jennifer Hester was a frequent diver with Defendant, who testified at trial and corroborated the United States' theory that Defendant was on notice of the Vessel's malfunctioning propeller on March 28, 2020, the day before M.C.G. died [*see* ECF No. 108 pp. 222–285 (full testimony)]. Hester testified that she was almost sucked under the Vessel by its propeller on the morning of March 28, 2020—saved only by her speargun [ECF No. 108 pp. 246–254; *see* ECF No. 91-6 (GX6), ECF No. 91-7 (GX7)]. Hester also testified that she saw a propeller engaging when it should have been in neutral during her dive and put the Defendant on notice, later that day via Facebook messenger, of a mechanical issue with one of the two propellers [ECF No. 108 pp. 254, 259, 263–264].[3] *See* ECF No. 91-11 (GX11 Facebook messages reflecting Hester's statements to Defendant on March 28, 2020, that port side prop was engaging and releasing improperly). Carl

[3] Defendant's cross-examination of Jennifer Hester focused on the sea conditions on March 28, 2020 [ECF No. 108 pp. 271–282]. She testified that the wind speeds and sea conditions were "average" and "pretty normal" [ECF No. 108 p. 279]. Defendant adopted the same line of questioning with Carl McManus. He reported that the conditions on March 28, 2020, were "pretty strong" winds and not a "real heavy sea" with "2-3 [foot waves which] is nice for diving" [ECF No. 108 pp. 309–310].

McManus, a frequent diver with Defendant who was also on the Vessel with Hester on March 28, 2020, testified that Defendant had trouble maneuvering the Vessel close to divers as he picked them up from the water that day, and that Defendant verbally acknowledged to McManus that day that he was having trouble controlling the Vessel [ECF No. 108 pp. 296–297].

Later during the afternoon of March 28, 2020, the Vessel ran aground as it almost allied with a nearby bridge [ECF No. 108 pp. 260–263 (Hester's testimony); *see also* ECF No. 109 pp. 22–28 (testimony of Officer Michael Abramczyk detailing first-hand account of March 28 grounding); ECF No. 109 pp. 122–123 (Kimberly Odom (crewmember) testifying that the Vessel was "drifting into the Parker Bridge"); ECF No. 91-1 (GX1 Marina Map)].  Dockmaster McKenna explained that Defendant attempted to pull the Vessel up to the fuel dock but was unable to control the Vessel until the dock became available, resulting in a twenty-to-thirty-minute grounding [ECF No. 109 pp. 16–18].  Carl McManus, who was aboard the Vessel as noted, testified that "there was something going on mechanically that there was a control problem" and the Vessel ran aground [ECF No. 108 p. 303].  Steve Poznak testified that Defendant himself admitted to him later that day that "he had an issue with the starboard engine" [ECF No. 109 pp. 44–47].  Poznak warned Defendant of the dangers and risks associated with the mechanical issues [ECF No. 109 pp. 44–47].  Poznak also told Defendant: "Obviously, you need to get this boat out of the water and fix the issue before you go out again" [ECF No. 109 pp. 46–47].

When the Vessel was grounded, Hester and McManus testified that Defendant's mechanic John Miller was waiting for them on land, but that they did not know whether he subsequently inspected the Vessel or not [ECF No. 108 pp. 277–279 (Hester); ECF No. 108 pp. 304, 315 (McManus)].  Inspector Goodman further testified that Defendant was required to alert the Coast Guard of the passenger vessel grounding on March 28, 2020, under Coast Guard policy, but that

Defendant never informed him of the incident [ECF No. 109 pp. 197–209 (explaining relevant criteria for reporting, including loss of propulsion)].

Less than a day later—on March 29, 2020—M.C.G. died as a result of Defendant's negligence as charged in Count I. Three eyewitnesses from the day of the death testified: dive instructor David Anderson, Captain Odom, and M.C.G.'s husband, Sean Flynn. Anderson testified that, on the morning of M.C.G.'s death, Defendant announced that he did not need to provide the required safety briefing to the divers because his boat was not registered with the Coast Guard [ECF No. 109 pp. 92–93; *see* ECF No. 109 p. 69 (Sean Flynn testifying to hearing the same statement)]. Sean Flynn then recounted his struggle to free his wife from the Vessel's propeller, eventually dislodging her and bringing her up to the boat, where she was pronounced deceased [ECF No. 109 pp. 78–85; ECF No. 91-42 (GX59 photo of victim's ripped wetsuit); ECF No. 93 (GX44, GX45 photos of victim)]. Sean Flynn also told the jury that he and his wife had no knowledge of prior mechanical issues on the Vessel, specifically, that Defendant made no mention of the propeller-incident with Hester or the grounding incident from the day before [ECF No. 109 p. 70]. Captain Odom—who was working on the Vessel that day—recounted the same scene, detailing everyone's cumulative efforts to pull the victim out from under the boat, perform CPR, and cut off her wetsuit in an attempt to save her life [ECF No. 109 pp. 130–137].

The United States then presented evidence surrounding the post-incident investigation. Investigator Fowler explained that the Vessel was examined thoroughly—but not seized—because Defendant was living on it at the time amid an ongoing divorce, and Defendant had operated the Vessel after the death to return it to the marina [ECF No. 109 pp. 157–161 (detailing investigation of the Vessel)]. Investigator Willems testified that he dove under the Vessel and observed damage to the propeller and fresh scratches on its hull, showing the jury numerous photos that he captured

[ECF No. 109 pp. 181–184; *see* ECF Nos. 91-19 through 91-25 (GX20 through GX27 (investigation photos and videos of the Vessel))]. Willems concluded, based on the markings, that the propeller made contact with the victim and could not have caused severe injuries unless it was engaged and under power at the time of impact [ECF No. 109 pp. 184–185]. Investigator Goodman stated that the Coast Guard would have taken action on the Vessel the previous day, March 28, 2020, had it been properly alerted of the mechanical issues and related grounding [ECF No. 109 pp. 200–201]. Allan Roth, an expert on Coast Guard regulations and vessel mechanics, stated that Defendant's modifications to the Vessel could cause issues with the propulsion system; specifically, the modifications could have caused the propellers to engage while the Vessel was in neutral [ECF No. 110 pp. 99–130]. And Captain Sandra Brammier, Defendant's friend, testified that she urged Defendant to ask the Coast Guard to examine the Vessel's engine at the scene, but that he never did [ECF No. 111 p. 116]. Finally, a medical examiner named Dr. Terrill Topps described the autopsy process, opining that the victim's cause of death was drowning as exacerbated by the deep chop wounds on her lower extremities [ECF No. 110 pp. 158–159; s*ee* ECF No. 93 (GX 109 sealed autopsy photos)].

*False Statement Charges* (Count II: 18 U.S.C. § 1001(a)(2))

The basis of Count II, which charged Defendant with one count of False Statement within the Jurisdiction of an Agency of the United States, was United States Coast Guard Form 1258, on which Defendant represented that his Vessel would be used only for "recreational purposes" despite using it for paid dive charters [ECF No. 91-58 (GX77)]. Andrea Walker, a Commercial Vessel Supervisor within the Coast Guard's National Vessel Documentation Center, testified to the discrepancy between the Form and Defendant's commercial scuba diving business [ECF No. 111 pp. 13–20]. As Walker further explained, the Coast Guard relied on Defendant's

representation that the Vessel would be used for recreation to issue him a vessel registration and certificate of documentation for a recreational boat rather than paperwork necessary for a commercial vessel [ECF No. 111 pp. 12–14; *see* ECF No. 91-53 (GX72)]. Walker noted that recreational vessels are not permitted to operate as small passenger vessels [ECF No. 111 pp. 20–21].

*Payment Protection Program Fraud* (Counts III–V: 18 U.S.C. § 1343)

To support the wire fraud counts in Counts III through V, *see* 18 U.S.C. § 1343, Althea Harris from the Small Business Administration testified that the Paycheck Protection Program (PPP) was created to help small businesses keep up with payroll obligations and stay open during the Covid-19 Pandemic, and that closed businesses were not eligible for the Program [ECF No. 110 pp. 161–189].

In February and May of 2021, Defendant submitted applications for two Paycheck Protection loans from Cross River and Celtic Bank, respectively [ECF No. 91-73 (GX 91 Cross River Application); ECF No. 91-67 (GX 85 Celtic Bank Application)].[4] Defendant subsequently applied for forgiveness of those loans in May 2021 and August 2021 [ECF No. 91-69 (GX 87); ECF No. 91-82 (GX98)].

The United States presented evidence that Defendant's business, Florida Scuba Charters, was closed due to the victim's death during the time period that Defendant reported it functional on his loan applications [ECF No. 91-109 (GX103 Florida Scuba Charters dissolution documents dated May 2021); ECF No. 91-63 (GX82 Defendant texts with Goodman that his business was

[4] Captain Sandra Brammier explained that she and Defendant discussed applying for the PPP, but she determined that she was ineligible [ECF No. 111 pp. 118–120]. Joshua Steib, an employee at the Palm Beach Marina where Defendant kept the Southern Comfort, testified that Defendant enlisted his help to print out and subsequently scan in applications for the PPP [ECF No. 111 pp. 38–42; *see* ECF Nos. 91-60 through 91-62 (GX79–81)].

"shut down")]. Specifically, Captain Cederholm testified that the Coast Guard issued Defendant a "Captain of the Port Order" dated April 9, 2020, which prevented Defendant from operating the Vessel after the victim's death [ECF No. 111 pp. 24–30; ECF No. 91-12 (GX12 Captain of the Port Order)]. Dockmaster McKenna testified that he did not see Defendant operating his scuba business—or at the marina at all—after the victim's death on March 29, 2020 [ECF No. 109 p. 18]. Steven Poznak testified that the Vessel was in poor condition with three feet of water inside the engine room when he took possession of it in November 2020, and that it could not have been used in that condition [ECF No. 109 pp. 50–51].

Defendant's ex-wife Kristy Kelly also testified that, in her estimation as the prior accountant for the business, the payroll and expense figures listed on Defendant's loan applications were inaccurate [ECF No. 110 pp. 204–208, 222–225; *see* ECF Nos. 91-84 through 91-106 (GX100 through GX100V, account history for Florida Scuba Charters)]. More to the point, Kelly testified that Florida Scuba Charters never had any payroll at all—apart from her and the Defendant as co-owners of the business [ECF No. 110 p. 204 (Kelly testifying that Florida Scuba Charters never paid out a traditional payroll because crew was paid in tips and free scuba charters)].

Two employees from the banks that issued Defendant's PPP loans also testified. Avi Pollack and Justin Masterman, of Cross River and Celtic Bank respectively, explained to the jury that their banks relied on the representations made by Defendant to grant, and then to forgive, Defendant's loans [ECF No. 111 pp. 45–79 (Pollack testimony); ECF No. 111 pp. 79–106 (Masterman testimony)]. Specifically, Pollack and Masterman testified that Cross River and Celtic Bank relied on Defendant's own representations that the money would be used, and was indeed used, for payroll and other authorized, limited business purposes when issuing and forgiving the loans [ECF No. 111 pp. 72–76 (Pollack); ECF No. 111 pp. 85–88 (Masterman); *see*

ECF Nos. 91-67 through 91-68 (GX85–GX86 Celtic Bank loan and forgiveness applications); ECF No. 91-69 (GX87); ECF No. 91-83 (GX99 Cross River loan and forgiveness applications)]. Special Agent Caleb King then reviewed Defendant's bank records, demonstrating that Defendant wired the loan money to his business account, where he then transferred it again to personal accounts or wrote checks that he cashed himself [ECF No. 111 pp. 135–153; *see e.g.*, ECF No. 91-107 (GX101 check to Defendant from Florida Scuba Charters); ECF No. 91-123 (GX116 Florida Scuba Charters deposit records)]. King also testified that Defendant made large personal purchases shortly after receiving the wires for items such as restaurant bills and a PGA National Gold Club membership [ECF No. 111 pp. 153–159; ECF No. 91-83 (GX99, $8,774.00 check from Defendant for PGA Membership dated 02/19/2021)].[5]

*The Defense Case*

Defendant testified in his defense [ECF No. 113 pp. 13–191; *see* ECF No. 113 pp. 10–11]. Defendant claimed that he was not on notice of a propeller issue on March 28, 2020, but rather heard "speculation that there was a problem from people who were not marine mechanics" and that he did "an inspection for at least an hour and a half" and found no problem [ECF No. 113 p. 172]. Defendant further claimed that his modifications to the Vessel could not have caused a propeller issue and that a propeller issue did not cause the victim's death [ECF No. 113 pp. 175–179]. His theory, as presented during trial, was that the ocean's rough current pushed the victim

[5] Defendant put forth the theory at trial, elicited through cross-examination of Agent Caleb King and his own testimony, that Florida Scuba Charters provides both scuba diving charters and golf lessons—his theory being that he lawfully obtained the PGA Membership in order to make a living [ECF No. 111 pp. 171–172; *see also* ECF No. 113 pp. 124, 133, 141]. He also claimed, without further corroboration, that the PGA Membership was paid for using a settlement that he received from a motorcycle crash, not funds from the PPP loans. On the other side of the balance, Agent Caleb King testified that Defendant was collecting unemployment benefits from the state of Florida during this period [ECF No. 111 pp. 140–141].

into the propeller, where her wetsuit became entangled [ECF No. 113 pp. 175–179]. Finally, Defendant testified that he simply relied on the advice given to him by Cross River and Celtic Bank when filling out the Paycheck Protection loans and "filled out the application as [he] was instructed" [ECF No. 113 pp. 78, 86, 136–137].

*The Instant Motion*

Defendant moves for acquittal under Federal Rule of Criminal Procedure 29(c) and makes four arguments: (1) the Court's denial of Defendant's request to sever the trial violated his right to a fair trial; (2) Defendant's inability to examine the vessel constitutes spoliation of evidence which undermined the fairness of the trial and rendered insufficient any evidence as to the vessel's propeller; (3) the Court's purported failure to include the decedent's toxicology reports "affected the trial's fairness and the integrity of the verdict"; and (4) the United States presented inaccurate tax forms to the jury and failed to present enough evidence to sustain Defendant's convictions as to the fraud counts [ECF Nos. 95, 101, 104].[6] [7]

[6] Defendant appears to move for acquittal under the incorrect subsection of Rule 29 [ECF No. 95 p. 1 (citing Fed. R. Crim. P. 29(a))]. Defendant's Motion requests relief under Rule 29(a), reserved for motions made prior to submission to the jury. *See* Fed. R. Crim. P. 29(a). The proper avenue is Rule 29(c) (allowing for a motion of acquittal within 14 days of a jury verdict), and so the Court analyzes the instant motion under Rule 29(c).

[7] In reply, Defendant makes a smattering of new, secondary arguments [ECF Nos. 101, 104]. These newly raised arguments include: (1) Jennifer Hester offered unreliable testimony; (2) there is no evidence to support that a "grounding" occurred, and Defendant testified to the contrary; (3) Defendant was not negligent because he enlisted his mechanic, John Miller, to examine the Vessel on March 28; (4) Dr. Tops' testimony concludes the cause of death was not the propeller but lack of timely medical treatment; (5) there is no evidence to support that Vessel modifications contributed to the incident; and (6) there is no proof of Defendant's criminal intent at the time he signed the loan documents [ECF Nos. 101, 104]. None of these arguments—raised for the first time in Reply—affects the Court's conclusion that ample evidence exists to support Defendant's convictions on all counts. *See Herring v. Sec'y, Dept. of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (refusing to consider new arguments raised in reply). However, the reply arguments are mentioned below to the degree they are relevant to the arguments raised in Defendant's Motion.

**LEGAL STANDARDS**

"In deciding a motion for entry of judgment of acquittal under Fed. R. Crim. P. 29(c), district courts should apply the same standard as that used for reviewing a conviction for sufficiency of the evidence." *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989) (citing *United States v. Cole*, 755 F.2d 748, 763–64 (11th Cir. 1985)). "The Court must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80 (1942), and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* "The prosecution need not rebut all reasonable hypotheses other than guilt. The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury." *Sellers*, 871 F.2d at 1021 (internal citations omitted).

"At least where some corroborative evidence of guilt exists for the charged . . . and the defendant takes the stand in his own defense, the defendant's testimony, denying guilt, may establish, by itself, elements of the offense." *United States v. Brown*, 53 F.3d 312, 314–15 (11th Cir. 1995); *id.* at 314 ("Most important, a statement by a defendant, if disbelieved by the jury, may be considered as *substantive evidence* of the defendant's guilt."). "[T]he jury, hearing [the defendant's] words and seeing [his] demeanor, [is] entitled to disbelieve the Defendant's testimony and, in fact, to believe the opposite of what []he said." *United States v. Williams*, 390 F.3d 1319, 1326 (11th Cir. 2004).

**DISCUSSION**

Addressing Defendant's arguments in the order in which they are presented in his Motion, and also for the reasons stated comprehensively by the United States in its Opposition to Defendant's Motion [ECF No. 98], the Motion is denied. As an overall matter, many of

Defendant's arguments are improper upon a Rule 29 motion because they challenge various judicial and party decisions made at trial rather than the sufficiency of evidence presented to the jury. The arguments that do challenge the sufficiency of the evidence are contradicted by the record, and there is a significant quantity of evidence supporting the jury's verdict, particularly given Defendant's largely uncredible testimony which the jury was entitled to disbelieve. *See Brown*, 53 F.3d at 314–15.

First, Defendant argues that acquittal is warranted as to all counts based on the Court's prior refusal to sever the trial into two separate trials—one for manslaughter and the other for fraud [ECF No. 95 pp. 3–8]. Specifically, Defendant argues that trying this case as it was charged "confused the jury and blurred the distinct elements required for each offense" such that Defendant received an unfair trial [ECF No. 3]. This argument lacks merit. As indicated by the Court in its Order Denying Defendant's Motion to Sever, the evidence at trial illustrated a linear narrative where Defendant fraudulently obtained bank loans in an effort to alleviate the financial fallout from the manslaughter [ECF No. 52]. A reasonable jury easily could have delineated the evidence supporting each count based on the United States' clear presentation, and there is no evidence or even suggestion that this jury deviated from that presumption. More fundamentally, a court's refusal to sever a trial is not proper grounds for acquittal under Rule 29(c). *See United States v. Avery*, 205 F. App'x 819, 825 (11th Cir. 2006) (affirming denial of Rule 29 motion and noting that non-sufficiency arguments are not contemplated in Rule 29). Any challenge to that decision should be raised on appeal as permitted by law.

Second, as best the Court can tell, Defendant argues that acquittal is warranted as to the seaman's manslaughter charge because the Vessel's engine could not be tested due to spoilation [ECF No. 95 p. 10]. Specifically, Defendant rejects the United States' theory that the victim's

death was caused by a propulsion issue and argues that such a conclusion would have been proven false by testing of the engine [ECF No. 95 p. 10]. Then, in Reply, Defendant focuses on the credibility of Jennifer Hester and Captain Ciederman—two of the United States' propeller-related witnesses—to argue that their corroborative testimony of the vessel's propeller issue is insufficient evidence to support a propeller issue on the Vessel [ECF No. 104 pp. 2–4]. These arguments provide no basis to disturb the jury's verdict. As the Court stated on the record in denying Defendant's Motion for Judgment of Acquittal under Rule 29(a), there was ample, evidence (even apart from the vessel inspection) to support Defendant's manslaughter conviction at trial [ECF No. 112 pp. 21–22]. Defendant was clearly negligent on March 29, 2020, particularly with respect to his duty to warn his passengers of a potentially dangerous condition on the Vessel and to ensure that his Vessel was in working order—after being put on notice on March 28, 2020, and failing to notify Coast Guard authorities. As detailed above, both Jennifer Hester and Carl McManus, who were on the Vessel, testified that it had mechanical trouble on March 28, 2020 [ECF No. 108 pp. 254, 259, 263–264; ECF No. 108 pp. 296–297]. Defendant himself admitted to Steve Poznak that the Vessel had engine trouble on that day and was advised not to take divers out until it was resolved [ECF No. 109 pp. 46–47]. Defendant was also required to (but did not) report the March 28 grounding to the Coast Guard, which would have led to more oversight as testified to by Investigator Goodman [ECF No. 109 pp. 197–205]. Defendant testified that his mechanic, John Miller, investigated potential issues and ruled them out on March 28, but even still, Defendant explicitly told his divers—the day the victim died—that he need not give them safety instructions [ECF No. 109 p. 69; ECF No. 109 p. 93]. This is all in addition to Defendant's non-compliance with Coast Guard rules and regulations. The Court sees no basis to upend the jury's verdict on sufficiency grounds, particularly given the jury's evident rejection of Defendant's testimony to the

contrary. *See Brown*, 53 F.3d at 312, 314–15 (allowing defendant's statements to serve as substantive evidence when discredited by the jury).

Further, even if Defendant's seaman's manslaughter conviction depended on propeller malfunctioning alone, there is sufficient evidence to support the conviction. Defendant argues again here—after unsuccessfully attempting to proffer this theory throughout trial—that additional inspection of the Vessel would have disproven the United States' propeller theory and supported his ocean-current theory as to the cause of M.C.G.'s death [ECF No. 95 p. 10; *see* ECF No. 114 p. 42]. The jury did not accept Defendant's claim as conveyed by Defendant himself in his substantive testimony, and the evidence clearly does not support it. Defendant fails to appreciate the slew of circumstantial evidence and corroborative testimony demonstrating the malfunctioning propeller, even without the results from the investigation of the Vessel (*e.g.*, testimony from Jordan McKenna, Officer Michael Abramczyk, Sandra Brammier, Investigator Jason Willems, and Carl McManus).[8] *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir. 1990) (rejecting defendant's claim on sufficiency challenge that more "reliable" testimony was necessary beyond witness testimony as weighed by the jury). Also, Captain Sandra Brammier testified that she urged Defendant to ask the Coast Guard to examine the Vessel's engine *at the scene*, but he never did [ECF No. 111 p. 16]. Simply put, there is sufficient evidence to support the jury's decision.

Third, Defendant argues that exclusion of the decedent's toxicology results "critically

[8] As for Defendant's new reply argument that, "[a]t no point did the Government propose any theories indicating that the vessel's refitting contributed to the incident," [ECF No. 104 p. 9], this is also belied by the record. Allan Roth testified at length that "modifying the vessel's cable system could cause serious issues with the vessel's propulsion system . . . [and that] this type of modification could cause the vessel's propellers to activate while the vessel was in neutral . . . [and that] the propellers would not be moving fast enough to bend a spear or cause the victim's injuries, if they had not been engaged" [ECF No. 98 p. 6]. The United States also developed this theory in both opening and closing arguments.

undermined the Defendant's case," because it "prevented the defense from presenting a complete narrative that might challenge the Government's claims regarding causation and responsibility" [ECF No. 95 pp. 11–12]. Defendant's objection as to the decedent's toxicology report is puzzling given that the parties stipulated to its exclusion at trial [*see* ECF No. 60 pp. 2–3 (parties agreeing that "neither side will be introducing evidence" pertaining to drugs in the victim's system "or her toxicology report more generally, agreeing that it is not relevant")]. This alone is sufficient under the invited-error doctrine to reject this argument. *See, e.g.*, *United States v. Stone*, 139 F.3d 822, 838 (11th Cir. 1998); *United States v. Harris*, 443 F.3d 822, 823–24 (11th Cir. 2006). Regardless, the jury heard ample evidence as to the victim's cause of death from drowning as exacerbated by chop wounds to her lower extremities [*see* ECF No. 110 pp. 136–160 (testimony of Dr. Terrill Tops concluding M.C.G. drowned and had severe chop wounds)]. The Court remains unconvinced that the jury's conclusion would have changed had they learned that the victim ingested a marijuana edible at some unidentified point prior to her death. Therefore, introduction of the Report, or any expert opinion stemming therefrom, would not have disrupted the conclusion that a reasonable jury could, and did, find Defendant guilty of Count I. *Sellers*, 871 F.2d at 1021 (highlighting that "the prosecution need not rebut all reasonable hypotheses," and the jury may choose among reasonable conclusions drawn from the evidence presented).

Finally, Defendant argues that acquittal as to the wire fraud counts is warranted because the United States presented "incorrect" tax forms to the jury and did not present evidence of an injury to the Internal Revenue Service specifically, as purportedly required under *United States v. Takhalov*, 827 F.3d 1307, 1312–1313 (11th Cir. 2016) [ECF No. 95 pp. 12–14].[9]

[9] In reply, Defendant appears to abandon this argument in favor of an entirely new argument—that he was simply relying on the advice of bank employees in preparing the fraudulent forms [ECF No. 101 p. 6]. The jury had ample evidence from which to reject this theory at trial. *See*

For a conviction of wire fraud to survive a sufficiency challenge, the United States must have presented sufficient evidence that the defendant "(1) intentionally participate[d] in a scheme or artifice to defraud another of money or property, and (2) use[d] or 'cause[d]' the use of . . . wires for the purpose of executing the scheme or artifice." *United States v. Bradley*, 644 F.3d 1213, 1238 (11th Cir. 2011) (quoting *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007)). *Takhalov* further specified that a "scheme to defraud" within the meaning of the federal wire fraud statute, 18 U.S.C. § 1343, "refers only to those schemes in which a defendant lies about the nature of the bargain itself" with an intent to cause injury. 827 F.3d at 1313–14. As memorialized in the Eleventh Circuit's pattern jury instructions, given to the jury in this case and agreed to by Defendant pre-trial and during trial [ECF No. 60 p. 3; ECF No. 77 pp. 15–16], " to act with 'intent to defraud' means to act knowingly and with the specific intent to use false or fraudulent pretenses, representations, or promises to cause loss or injury. Proving intent to deceive alone, without the intent to cause loss or injury, is not sufficient to prove intent to defraud." 11th Cir. Pattern Jury Instruction O51 [ECF No. 77 pp. 15–16].

To begin, the United States presented ample evidence, both documentary and through the testimony of bank representatives, that the disputed tax documents were the documents attached to Defendant's fraudulent Paycheck Protection Program loan applications [ECF No. 111 pp. 55–57, 60–62; ECF No. 111 pp. 84–88]. To the degree Defendant now accuses the United States of "submitting inaccurate forms [to the jury] and falsely asserting they were correct and legitimate documents" [ECF No. 95 p. 13], he did not argue or provide any evidence to that effect at trial.

---

*Brown*, 53 F.3d at 312, 314–15. Defendant also newly argues that the jury could not infer by the trial evidence that he "did not intend to use the funds as stated at the time he signed the loan documents" [ECF No. 104 p. 7]. The Court disagrees, accepts the jury's weighing of Defendant's testimony, and is not persuaded by Defendant's newly raised reply-argument.

The parties signed a mid-trial stipulation that recognized that the forms Defendant attached to his loan applications were never actually submitted to the IRS, and regardless, the sufficiency of the evidence for the wire fraud charges does not hinge on whether he filed his taxes properly or committed some other act of fraud having to do with tax forms [ECF No. 129 (Defendant signing stipulation that the tax returns submitted to Cross River Bank were never actually filed with the IRS); ECF No. 111 pp. 100–101].

Defendant also misreads *Takhalov* as requiring an actual injury to the victim, which Defendant mistakes as the IRS [ECF No. 95 p. 13 (arguing acquittal is proper because "the IRS has not been defrauded out of anything")]. As mentioned, *Takhalov* and the Eleventh Circuit's pattern instructions make clear that the United States "doesn't have to prove that the alleged scheme actually succeeded in defrauding anyone" [ECF No. 77 p. 16]. Defendant seems to misunderstand this accepted proposition to which he agreed at trial, effectively asking the Court to read in an actual-harm requirement after the fact. There is no basis for that request. In any event, the United States presented more than sufficient evidence that Defendant intended to obtain loans to which he was not entitled and that he received them by misrepresenting the status of his business activities, thus obtaining money from Cross River and Celtic Banks through material deception. *Takhalov* requires nothing more. Defendant is also incorrect as a factual matter because the PPP was run by the Small Business Administration and participating private banks, not the IRS [*see* [ECF No. 110 pp. 161–189 (testimony from Althea Harris explaining program structure)].

Finally, any defense that Defendant was relying on the advice of bank employees was presented by Defendant himself during his trial testimony. The jury was entitled to disbelieve this unsubstantiated theory in the face of evidence to the contrary. *See Brown*, 53 F.3d at 314–

15.

Defendant has set forth no basis for acquittal under Rule 29(c).

**CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Judgment of Acquittal [ECF No. 95] is **DENIED**.

**ORDERED** in Chambers at Fort Pierce, Florida, this 6th day of August 2025.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record